# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 31 2018, 7:45 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Don R. Hostetler
Hostetler Law LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Andrea E. Rahman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

I.S. *(Minor Child)*

and

T.S. *(Mother)*,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

and

August 31, 2018

Court of Appeals Case No.
18A-JT-553

Appeal from the Marion Superior Court

The Honorable Gary Chavers, Judge Pro Tem

The Honorable Scott Stowers, Magistrate

Trial Court Cause No.
49D09-1708-JT-734

Child Advocates, Inc.
*Appellee-Guardian Ad Litem*

**Robb, Judge.**

# Case Summary and Issue

[1]     T.S. ("Mother") appeals the juvenile court's termination of her parental rights to I.S. ("Child"), raising three issues for our review which we consolidate and rephrase as whether the juvenile court's termination order is supported by clear and convincing evidence.  Concluding the termination is not clearly erroneous, we affirm.

# Facts and Procedural History

[2]     Mother and W.S. ("Father")[1] are the parents of Child, who was born February 2, 2003.  On June 8, 2015, the Indiana Department of Child Services ("DCS") filed a petition alleging Child, then twelve years old, was a child in need of services ("CHINS") because Child was living with Mother in a motel unsuitable for children and Mother tested positive for "methamphetamine, amphetamine, opiates, barbiturates, and THC."  Exhibits at 4-5.  Child was

---

[1] Father's parental rights were also terminated but he does not participate in this appeal.

placed in the care of her paternal aunt, L.P., where—save a two-month temporary trial visit with Mother—Child has resided for the duration of this CHINS case.

[3]     Mother waived the CHINS fact-finding and the juvenile court adjudicated Child a CHINS on September 9, 2015. With the goal of reunification, Mother was ordered to complete a substance abuse assessment, submit to random drug screenings, and participate in home-based therapy as well as home-based case management. Mother completed an intensive outpatient treatment program from August 2015 to January 2016, and began working with Tiffany Burnett, a therapist for Families First.

[4]     The juvenile court conducted a review hearing on April 13, 2016. There, the juvenile court noted there were concerns that Mother's drug levels were consistently high and DCS was attempting to contact Mother's physicians to verify that her prescribed medication would produce those high drug levels. Three months later, DCS reported that Mother had four clean drug screens and requested that Mother have unsupervised parenting time. The juvenile court granted Mother unsupervised parenting time and Child returned to Mother's care for a trial visit on September 6, 2016. Shortly before Child returned to Mother's care for the trial visit, however, Mother tested positive for methamphetamine and amphetamine, even though she indicated that she was no longer taking prescription medication. Mother was retested, and that drug screen showed a negative result. Child indicated that the trial visit was going

well so the juvenile court ordered that the trial visit should continue contingent upon Mother submitting to drug screens at least two times per week.

[5]     At a detention hearing requested by DCS on November 2, 2016, DCS reported that Mother recently tested positive for buprenorphine and that Mother did not submit to drug screens after that positive result. DCS renewed its motion for removal and the guardian ad litem ("GAL") agreed the Child should be removed. Over Mother's argument that she had not received notifications to submit to drug screens, the juvenile court granted DCS's motion for removal, thus ending the two-month trial visit, and Child returned to L.P.'s care.

[6]     The juvenile court conducted a review hearing on November 30, 2016. There, Burnett stated that "she does not feel that [Child's] current placement is a good place for [Child] due to the number of personal issues [L.P.] has with [M]other." Exhibits at 77. Mother's counsel also expressed concerns regarding "derogatory remarks that [L.P.] has made in the presence of [Child]." *Id.* The juvenile court ordered L.P. not to speak of Mother in a disparaging manner in the presence of Child and maintained Child's placement with L.P. with the continued goal of reunification with Mother.

[7]     Following the termination of the trial visit, Mother again relapsed following the death of her father and ex-husband in the same week, both due to substance abuse issues. Mother completed a substance abuse assessment with Families First and was referred to substance abuse treatment beginning in December

2016. Two months into the program, however, Mother relapsed on opiates and methamphetamine and stopped attending treatment sessions.

[8]  At a permanency hearing on August 9, 2017, DCS requested that the permanency plan be changed from reunification to adoption because Child, who was "of an age where her consent to a guardianship or adoption is required," Exhibits at 93, "is in agreement [with the change] and [M]other is not engaged in services to address her substance abuse," *id*. at 99. The juvenile court ordered the permanency plan for Child be changed to adoption. DCS filed a verified petition for the termination of Mother's parental rights on August 21, 2017. After a fact-finding hearing, the trial court issued an order on March 1, 2018, terminating both Mother and Father's parental rights. Mother now appeals.

# Discussion and Decision

## I. Standard of Review

[9]  The right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re D.D.*, 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied*. A parent's interest in the care, custody, and control of his child is "perhaps the oldest of the fundamental liberty interests." *Bester v. Lake Co. OFC*, 839 N.E.2d 143, 147 (Ind. 2005). However, the law provides for the termination of these constitutionally protected rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008).

When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *In re D.D.,* 804 N.E.2d at 265. We only consider evidence, and reasonable inferences therefrom, most favorable to the judgment. *Id.* Furthermore, in deference to the juvenile court's unique position to assess the evidence, we only set aside its judgment terminating a parent-child relationship when it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*, 534 U.S. 1161 (2002).

The juvenile court entered findings of fact and conclusions thereon as required in termination cases,[2] and we therefore apply a two-tiered standard of review. *Bester*, 839 N.E.2d at 147. We must first determine whether the evidence supports the findings; then we determine whether the findings support the judgment. *Id.* Findings will only be set aside if they are clearly erroneous and findings are only clearly erroneous "when the record contains no facts to support them either directly or by inference." *Yanoff v. Muncy,* 688 N.E.2d 1259, 1262 (Ind. 1997).

## II. Termination of Parental Rights

The involuntary termination of parental rights is "an extreme measure that is designed to be used as a last resort when all other reasonable efforts have

---

[2] Indiana Code section 31-35-2-8 provides, "if the court finds the allegations in a petition . . . are true, the court shall terminate the parent-child relationship" and "shall enter findings of fact that support the entry of the conclusions."

failed." *In re C.G.,* 954 N.E.2d 910, 916 (Ind. 2011). To terminate parental rights, Indiana Code section 31-35-2-4(b)(2) requires the State to prove, in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

The foregoing elements must be proved by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016). "Because subsection (b)(2)(B) is written in the disjunctive, . . . the [juvenile] court need only find one of the two elements by clear and convincing evidence." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 373 (Ind. Ct. App. 2006) (citation omitted), *trans. denied*.

[13]     Here, the juvenile court found that the State proved both subsections (i) and (ii) of Indiana Code section 31-35-2-4(b)(2) by clear and convincing evidence and that the termination of Mother's parental rights was in the best interests of Child. Mother now challenges the sufficiency of the evidence to support each of these three findings.

## A. Remedy of Conditions

[14]     Mother argues the State failed to prove by clear and convincing evidence that the conditions resulting in Child's removal will not be remedied because three of the juvenile court's findings supporting such a conclusion were clearly erroneous. In turn, the State admits that two of the findings are unsupported by the record but contends the remaining findings are sufficient to support the juvenile court's conclusion. We agree with the State.

[15]     The juvenile court found:

> 24. There is a reasonable probability that the conditions that resulted in the child's removal and continued placement outside of the home will not be remedied by her mother. When the CHINS case was filed, [Mother] was using several illicit substances including methamphetamine, amphetamine, opiates, barbiturates, and marijuana. Even though [Mother] has had two and a half years to address substance abuse, she has failed to engage in substance abuse treatment or any services toward obtaining and maintaining sobriety. She has not submitted to a screen in the last six months, and in the three months prior to August 2017, she missed 31 drug screens.

Appellant's Appendix, Volume II at 14-15.

[16] First, Mother argues the finding that she "has failed to engage in substance abuse treatment or *any* services toward obtaining and maintaining sobriety," *id.* (emphasis added), is "demonstrably wrong." Brief of Appellant at 15. Indeed, the juvenile court also found that Mother completed an intensive outpatient treatment program and participated, although unsuccessfully, in a substance abuse program. *See* Appellant's App., Vol. II at 13-14, ¶¶ 8, 11. The State agrees with Mother that the juvenile court's finding is "inconsistent with the [juvenile] court's other findings because Mother did participate in substance abuse programming." Brief of Appellee at 18. Therefore, to the extent the juvenile court found Mother failed to engage in "any services toward obtaining and maintaining sobriety," Appellant's App., Vol. II at 15, we agree that its finding is clearly erroneous.

[17] Second, Mother argues the juvenile court's finding that "she missed 31 drug screens," *id.*, has no basis in the evidence. Again, the State admits that "Mother is correct that this finding appears to be based on a statement made by the GAL attorney to [M]other and not sworn testimony," and the "progress report cited by the GAL attorney as evidence of Mother's 31 missed drug screens is not one of the 25 exhibits submitted as evidence." Br. of Appellee at 17-18. Therefore, this finding is clearly erroneous.

[18] And third, Mother contends the juvenile court's finding on March 1, 2018, that she "has not submitted to a [drug] screen in the last six months," Appellant's App., Vol. II at 15, "wholly ignores that [Mother] ceased being offered drug screens by DCS after August 2017 because [Child] expressed a wish to be

adopted." Br. of Appellant at 15. Again, Mother's assertion appears to be correct. The record reveals that DCS discontinued offering Mother random drug screens after the permanency plan changed to adoption. Considering the evidence in the record and the fact that the State fails to respond to this argument, we conclude that that this finding too is clearly erroneous.

[19] Having concluded three of the juvenile court's findings supporting its conclusion that the conditions that resulted in Child's removal will not be remedied are clearly erroneous, we consider the juvenile court's conclusion as a whole. When considering whether the conditions that resulted in a child's removal will be remedied, "First, we must ascertain what conditions led to [Child's] placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013) (quotation omitted). "[I]t is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*.

[20] Here, Child was originally removed from Mother's care because Child was living with Mother in a motel unsuitable for children and Mother tested positive for "methamphetamine, amphetamine, opiates, barbiturates, and THC." Exhibits at 4-5. Mother does not contest the reasons Child was removed from her home but argues the State failed to prove by clear and convincing evidence that the conditions would not be remedied. Aside from the three clearly

erroneous findings discussed above, however, Mother provides no further argument regarding the juvenile court's conclusion. And, although we must "disregard any special finding that is not proper or competent to be considered[,]" *In re B.J.*, 879 N.E.2d 7, 19 (Ind. Ct. App. 2008), *trans. denied*, given the remaining evidence and the court's other accurate findings, we find these errors harmless, s*ee id.* at 20 (affirming termination of parental rights despite erroneous finding based on testimony stricken from the record because the error did not "constitute the sole support for any conclusion of law necessary to sustain the judgment"); *Matter of A.C.B.,* 598 N.E.2d 570, 573 (Ind. Ct. App. 1992) (affirming termination of parental rights despite erroneous findings because error was "not of such magnitude that it calls into question the court's conclusion").

[21]  In order to determine whether there is a reasonable probability that the conditions leading to a child's removal from a home will not be remedied, a juvenile court must evaluate a "parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child," as well as consider the services the State has offered to the parent and the parent's response to such services. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). Mother was ordered to complete a substance abuse assessment, submit to random drug screenings, and participate in home-based therapy and home-based case management. We recognize Mother's early compliance with services, such as participation in home-based therapy and the completion of an intensive outpatient treatment program, resulted in a trial visit. The trial visit,

however, was ended after only two months when Mother tested positive for buprenorphine and failed to submit to further drug screens. Thereafter, Mother requested additional substance abuse treatment, but relapsed and stopped attending treatment sessions after only two months in the program.

[22] Moreover, the record before us tends to indicate that Mother's substance abuse issues appear to be worsening or, at best, remaining stagnant. For example, the GAL testified that throughout the history of this case, most of Mother's drug screens were "always positive" for "illegal substances." Transcript, Volume II at 78. Mother admitted to using methamphetamine and narcotics were found in Mother's home during a supervised visit as recently as August 2017. And, at the time of the termination hearing in January and February of 2018, Mother testified that she was facing criminal charges for possession of methamphetamine and drug paraphernalia.

[23] Quite simply, the record before us is replete with evidence of Mother's ongoing drug addiction but conspicuously absent of Mother's attempts to overcome that addiction or success in doing so. As we oft note, the State need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). We therefore conclude the State satisfied its burden and the juvenile court did not err in its determination that the conditions which led to Child's removal would not be remedied.

# B. Well Being of Child

Next, Mother contends the State did not present clear and convincing evidence that the continuation of the parent-child relationship poses a threat to Child's well-being. Having already determined the juvenile court did not err in concluding that the conditions that led to Child's removal would not be remedied and in light of the fact that Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address Mother's argument in this regard. *See In re I.A.,* 903 N.E.2d 146, 153 (Ind. Ct. App. 2009). Suffice it to say, given Mother's history of drug use, continuing struggles with addiction, and Mother's lack of effort or success in overcoming her addiction, we conclude the juvenile court did not err in concluding there was a reasonable probability that the continuation of the parent-child relationship poses a threat to Child's well-being. *See In re D.L.*, 814 N.E.2d 1022, 1029 (Ind. Ct. App. 2004) ("The inevitable conclusion is that when [mother] abuses drugs, she endangers her children in a variety of ways."), *trans denied*.

# C. Best Interests of Child

Finally, the juvenile court concluded:

> 26. Termination of the parent-child relationship is in [Child's] best interests. Termination would allow [Child] to be adopted into a stable and permanent home where [Child's] needs will be safely met.

Appellant's App., Vol. II at 15. Mother contends there was insufficient evidence that termination was in the best interests of Child because termination

of parental rights cannot be based solely on the fact that there is a better place for the child to live, and the juvenile court "wholly ignored how [L.P.] poisoned the relationship between [Mother] and [Child] instead of encouraging a positive relationship between [Child] and [Mother] during the course of the CHINS proceeding." Appellant's Br. at 17.

[26] We conclude there was sufficient evidence for the juvenile court to determine the termination was in the best interests of Child. In determining what is in the best interests of a child, the juvenile court is required "to look beyond the factors identified by [DCS] and to consider the totality of the evidence." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). And, in addition to evidence that conditions resulting in removal will not be remedied, the recommendations of the DCS case manager and court-appointed advocate to terminate parental rights are sufficient to show by clear and convincing evidence that termination is in a child's best interests. *Id.* Here, Joan Ossip, the court-appointed advocate, testified that termination of Mother's parental rights was in Child's best interests because of Mother's ongoing drug issues and the fact that L.P. provided "a safe, secure, loving home, and [Child is] doing really well." Tr., Vol. II at 63. Talia Anderson, the DCS case manager, expressed agreement with Ossip that termination of Mother's parental rights and adoption by L.P. was in Child's best interests, stating:

> I visit [L.P.'s] home with [Child] there every month, and I've never had any concerns, their relationship is fantastic, they communicate with each other, and then also [Child] is there with

> her half-brother and they have a typical sibling relationship, they, I do think they function well as a family.

*Id.* at 96. Considering the evidence that conditions resulting in Child's removal will not be remedied, this testimony alone is sufficient to support the juvenile court's conclusion. *See A.D.S. v. Indiana Dep't of Child Servs.* 987 N.E.2d 1150, 1159 (Ind. Ct. App. 2013) (where there was evidence of mother's issues with substance abuse and domestic violence along with testimony from the DCS case manager and the GAL which supported termination, the court concluded "this evidence alone is sufficient to support the trial court's conclusion that the best interests of the Children are served by terminating parental rights"), *trans denied*. Nevertheless, we consider Mother's additional arguments.

[27] First, Mother contends that termination of her parental rights cannot be based solely on the fact that there is a better place for the child. Although "[p]ermanency is a central consideration in determining the best interests of a child," *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009), Mother correctly asserts that "[a] parent's right to his child may not be terminated solely because there is a better place for the child to live," Appellant's Br. at 19 (quoting *In re A.B.*, 888 N.E.2d 231, 239 (Ind. Ct. App. 2008), *trans. denied*). Mother's argument, however, presupposes that the first sentence of the juvenile court's conclusion, "[t]ermination of the parent-child relationship is in [Child's] best interest," is premised upon the second sentence, "[t]ermination would allow [Child] to be adopted into a stable and permanent home where her needs will be safely met." Appellant's App., Vol. II at 15, ¶ 26. We disagree with this characterization

because the record contained sufficient evidence for the juvenile court to conclude termination was in the best interests of Child outside of the consideration of adoption. The juvenile court's conclusion is only strengthened by its finding that adoption would provide a "stable and permanent home." *Id.*

[28] Second, Mother alleges that in arriving at its conclusion regarding the best interests of Child, "the juvenile court wholly ignored how [L.P.] poisoned the relationship between [Mother] and [Child]." Appellant's Br. at 17. In so arguing, Mother relies on the facts that the juvenile court had admonished L.P. "not to speak in a disparaging manner of [M]other in the presence of [Child]," Exhibits at 77, Mother's therapist testified that Child's placement with L.P. was not a good place for Child "due to the number of personal issues the caregiver has with Mother," *id.*, and the juvenile court previously observed that "[t]here are concerns with [C]hild returning to her previous placement [with L.P.] due to the issues that occurred when [C]hild was transitioning back into [Mother's] care," *id.* at 70. In this regard, we agree with the State that "[s]uch relationship issues are to be expected in situations fraught with drug abuse and neglect." Br. of Appellee at 28. Indeed, unfortunately, and all too often, adults under these circumstances attempt to influence a child's opinions regarding one another instead of simply allowing their actions to speak for themselves.

[29] Here, although the record reveals evidence of L.P. making disparaging comments regarding Mother and an apparently hostile relationship between the two, we do not find the evidence sufficient to call Child's decision to be adopted into question. Moreover, the record reveals substantial evidence supporting the

juvenile court's findings that Child "is doing well and her needs are being met" in L.P.'s care, and that, "[t]here is a strong relationship between [Child] and [L.P.] and they are well-bonded." Appellant's App., Vol. II at 14.

[30] Considering the evidence that conditions resulting in Child's removal will not be remedied, continuation of the parent-child relationship poses a threat to Child's well-being, and the totality of the evidence, the juvenile court did not err in concluding termination of Mother's parental rights was in the best interests of Child.

# Conclusion

[31] The juvenile court's decision to terminate Mother's parental rights was not clearly erroneous, and therefore, we affirm.

[32] Affirmed.

Baker, J., and May, J., concur.